# GOVERNMENT GUARANTEE FUND OF THE REPUBLIC OF FINLAND, SAASTOPANKKIEN KESKUS-OSAKE-PANKKI (SKOPBANK), 35 ACRES ASSOCIATES, 12 ACRES ASSOCIATES and BENEFORI OY, Plaintiffs

## v.

## HYATT CORPORATION, Defendant

Civ. No. 1995-49

District Court for the Virgin Islands

Div. of St. Thomas and St. John

January 28, 1997

357

Warren B. Cole, Esq., (Hunter, Colianni, Cole & Turner), Michael Baylson, Esq., Edward B. Biester, III, Esq., (Duane, Morris & Heckscher), *for Plaintiffs*

John Zebedee, Esq., (Hymes & Zebedee), James Renard, Esq., John Sopuch, Esq., Jamil Alibhai, Esq., (Bickel & Brewer), *for Defendant*

MOORE, *Chief Judge*

## OPINION

### TABLE OF CONTENTS

I. FACTUAL AND PROCEDURAL BACKGROUND ......... 360
II. DISCUSSION .................................................... 362
 A. Motion to Dismiss ............................................ 362
 1. Standard of Review .......................................... 362
 2. Res Judicata, Collateral Estoppel and Law of the Case 364
 3. D'Oench, Duhme Doctrine .................................. 365

4. Sufficiency of Individual Counterclaims ................... 365
 a. Breach of Contract (Count One) ......................... 366
 b. Anticipatory Repudiation (Count Two) ................. 367
 c. Breach of Warranty (Count Eight) ....................... 367
 d. Breach of Guaranty of Payment and Performance
 (Count Ten) ............................................... 368
 e. Tortious Interference with Contracts Against
 Skopbank and GGF (Count Three) ..................... 369
 f. Tortious Interference with Prospective Economic
 Advantage Against Skopbank and GGF (Count
 Four) ....................................................... 375
 g. Conspiracy Against Skopbank and GGF
 (Count Five) ............................................... 377
 h. Equitable Estoppel Against Skopbank (Count Six) . . 381
 i. Unjust Enrichment Against Skopbank and GGF
 (Count Seven) ............................................. 384
 j. Fraud (Count Nine) ...................................... 385
 k. Fraudulent Conveyance Against Skopbank and
 35 Acres (Count Eleven) ................................. 388
 l. Prima Facie Tort Against All Counterdefendants
 (Count Twelve) ............................................ 389
5. *Conclusion* .................................................... 391
B. Motion to Enjoin .............................................. 391
1. *Procedural Background* ....................................... 391
2. *Discussion* ................................................... 392
C. Motion for Partial Summary Judgment for Equitable
 Accounting .................................................... 396
D. Motion to Dismiss Government Guarantee Fund of
 the Republic of Finland as a Party Plaintiff .............. 397
III. CONCLUSION ................................................. 398

### MEMORANDUM

On December 19, 1996, the Court heard argument on several outstanding motions filed by plaintiffs Government Guarantee Fund, Skopbank, 35 Acres Associates, 12 Acres Associates and Benefori Oy. The pending motions are as follows: (1) Skopbank Parties' Motion to Strike and Dismiss Hyatt's First and Second Amended Counterclaim ("Motion to Dismiss"); (2) Skopbank

Parties' Motion to Enjoin Prosecution of Litigation Against Michael Stanton in New York, and to Enjoin Institution of Related Litigation ("Motion to Enjoin"); (3) Skopbank Parties' Motion for Partial Summary Judgment on a claim for equitable accounting ("Motion for Partial Summary Judgment"); and (4) Skopbank Parties' Motion to Dismiss Government Guarantee Fund of the Republic of Finland as a Party Plaintiff ("Motion to Dismiss GGF"). Each of these motions will be addressed in turn.[1]

## I. Factual and Procedural Background

This litigation concerns a dispute over the management and control of a resort located on St. John ("the hotel") owned by 35 Acres Associates and previously managed by the Hyatt Corporation. The facts of this case have previously been recited in opinions by this Court, the Court of Appeals for the Third Circuit, and the district court for the Southern District of New York. *See, Government Guarantee Fund v. Hyatt Corp.*, 95 F.3d 291 (3d Cir. 1996); *Government Guarantee Fund v. Hyatt Corp.*, 34 V.I. 257, 166 F.R.D. 321 (D.V.I.), *aff'd*, 95 F.3d 291 (3d Cir. 1996); *Hyatt Corp. v. 35 Acres Assoc.*, No. Civ. 1995-49, 1995-68, 1996 WL 165008 (D.V.I. Jan. 8, 1996); *Hyatt Corp. v. Stanton*, 945 F. Supp. 675 (S.D.N.Y. 1996). Thus only a brief recitation of the facts is included here.

Skopbank, a Finnish banking corporation, loaned approximately 100 million dollars to a private developer, Great Cruz Bay Development Co. ["Great Cruz"] to facilitate the financing, development and construction of the resort on St. John. When Great Cruz encountered difficulty in meeting its mortgage obligations, Skopbank demanded that Great Cruz hire a management corporation such as "Hyatt Corporation or another management group similar in size and reputation to the Hyatt Corporation." (Hyatt's Second Amended Counterclaim ["Counterclaim"], at ¶ 13.) In March of 1990 Skopbank, Great Cruz and Hyatt entered into a series of agreements which resulted in Hyatt becoming manager of the resort, and Skopbank lending Great Cruz an additional 10.5 million dollars. The agreements include: (1) a management agree-

---

[1] Also pending are Skopbank Parties' Motion to Award Damages under Supersedeas Bond and Skopbank Parties' Petition for Attorney's Fees. Ruling on these motions will be deferred until the merits of the case have been determined.

ment signed by Hyatt and Great Cruz; (2) a transition agreement signed by Hyatt and Great Cruz; (3) a subordination, nondisturbance and attornment agreement ("subordination agreement") signed by Skopbank and Hyatt; (4) a letter agreement signed by Hyatt and Skopbank; and (5) a guaranty letter signed by Skopbank. The agreements are collectively referred to as the "March 1990 Agreements."

The management agreement stated that Hyatt would have "absolute control and discretion" over the operation of the hotel for 30 years, essentially limiting the owner's right to terminate to poor performance by Hyatt. (Management Agreement at §§ 4.2, 4.5.) In return for managing the Hotel, Hyatt was to receive a base fee of 1.4 percent of gross revenue, as well as an incentive fee structured on positive cash flow. The transition agreement set out the terms for the transition from Great Cruz as manager of the hotel to Hyatt as manager, as well as the terms of how a renovation program was to be undertaken. The letter agreement directed Hyatt to pay Skopbank any sums due under the management agreement. The subordination agreement set forth the rights of the parties should Skopbank foreclose its mortgage to Great Cruz, including a warrant by Skopbank that the management agreement would continue in full force and effect so long as Hyatt was not in default. (Subordination Agreement at §§ 2, 3.) Finally the guaranty letter signed by Skopbank guaranteed payment of the owner's obligation to pay for all costs and expenses incurred in connection with a renovation program at the hotel, and the owner's obligation to provide working capital to Hyatt. (Guaranty at 1-2.)

Even after Hyatt took over management of the resort, Great Cruz continued to fail to meet its mortgage obligations to Skopbank. In 1991, Skopbank initiated foreclosure proceedings against Great Cruz. Control of Skopbank in the interim had been taken over by the Government Guarantee Fund ("GGF"), a Finnish governmental agency, as part of GGF's handling of the Finnish banking crisis. To effectuate the settlement of the foreclosure litigation, Hyatt cooperated with Skopbank and GGF by releasing monies belonging to the resort but under Hyatt's control. At the Marshal's sale on March 20, 1995, the resort was purchased by 35 Acres, a general Virgin Islands partnership consisting of two Finnish corporations

which are wholly owned by Skopbank. Soon after the Marshal sale, 35 Acres sent Hyatt letters terminating the management agreement.

GGF and Skopbank filed suit against Hyatt (Civil No. 1995-49) on March 16, 1995, seeking a declaratory judgment finding Hyatt in breach of the management agreements and alleging various claims in tort and contract. GGF and Skopbank filed an amended complaint on November 8, 1995, adding 35 Acres as an additional plaintiff. On April 25, 1995 Hyatt filed suit against 35 Acres (Civil No. 1995-68), and thereafter filed two amended complaints. The second amended complaint in Hyatt's suit sought a declaratory judgment that Hyatt was not in breach of the agreements and could continue as manager of the resort, recovery for civil conspiracy and punitive, compensatory and consequential damages.

This Court dismissed without prejudice Hyatt's complaint in Civil No. 1995-68 in a memorandum and order dated January 8, 1996. *Hyatt v. 35 Acres*, 1996 WL 165008. Hyatt did not appeal that order. In the Skopbank Parties' suit, 35 Acres sought a partial summary judgment that the agency relationship with Hyatt was terminated as a matter of law and that 35 Acres was entitled to possession of the resort, and Hyatt must leave the premises. The Court granted 35 Acres' motion in a memorandum and order dated April 10, 1996. *GGF v. Hyatt*, 166 F.R.D. 321. Hyatt appealed that order to the United States Court of Appeals for the Third Circuit. This Court's rulings were affirmed in all respects. *GGF v. Hyatt*, 95 F.3d 291.

## II. Discussion

### A. Motion to Dismiss

#### 1. *Standard of Review*

■ Skopbank Parties filed their motion to dismiss Hyatt's First and Second Amended Counterclaim[2] under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can

---

[2]This Court will only address the motion as it pertains to Hyatt's Second Amended Counterclaim. 6 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1476, at 556-57 (2d ed. 1990) ("Once and amended pleading is interposed, the original pleading no longer performs any function in the case.")

be granted. When deciding a 12(b)(6) motion to dismiss, the counterclaim must be read in a light most favorable to the counterclaimant, and all of the factual allegations must be taken as true. *Ransom v. Marrazzo*, 848 F.2d 398, 401 (3d Cir. 1988). However, legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness. *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 23 (1st Cir. 1990) ("exempting, of course [from what the court must accept] those 'facts' which have since been conclusively contradicted by [the pleader's] concessions or otherwise, and likewise eschewing any reliance on bald assertions, unsupportable conclusions, and 'opprobrious epithets.'") As noted in *Fleming*, "the pleadings are not sufficient where the plaintiff rests on 'subjective characterizations' or unsubstantiated conclusions." *Id.*

■ When ruling on a motion to dismiss, courts may consider undisputed documents relied upon by the claimant even if such documents are not attached to the claimant's pleading. *Pension Benefit Guaranty Corp. v. White Consol. Indus. Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (holding that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document"); 5 Charles Alan Wright & Arthur R. Miller, Federal Practice Procedure § 1327, at 762-63 (2d ed. 1990). The court may reject legal conclusions or factual claims of the claimant that are contradicted by the documents relied upon in the complaint or counterclaim. *See, e.g. Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 879 & n.3 (1st Cir. 1991) (affirming that plaintiffs had no claim for fraud in light of statements in prospectus).

Matters of public record may also be considered on a motion to dismiss. *Hotel & Restaurant Employees International Union v. Stadium Hotel Partners, L.P.*, 1994 WL 585707 at * 2 (E.D.Pa.1994) ("On a motion to dismiss a court may properly look beyond a complaint to matters of public record and doing so does not convert a Rule 12(b)(6) motion to one for summary judgment," citing *Mack v. South Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986)); 5A Wright & Miller, supra, § 1364, at 475-80 ("A wide range of material may be introduced in conjunction with a 12(b) motion . . . contracts, . . . depositions . . . court judgments and arguments,

prior pleadings, transcripts of prior court proceedings, and matters of public record.")

Hyatt's second amended counterclaim alleges 12 causes of action against various combinations of GGF, Skopbank and 35 Acres [hereinafter "Skopbank Parties" or "counterdefendants"] sounding in tort and contract.[3] This Court concludes that nine of these counterclaims must be dismissed for failure to state a claim upon which relief can be granted.

## 2. *Res Judicata, Collateral Estoppel and Law of the Case*

The Skopbank Parties first argue that the doctrines of res judicata, collateral estoppel and law of the case bar all twelve of Hyatt's counterclaims. They rely on this Court's prior rulings on January 8, 1996 and April 10, 1996 and the Court of Appeals' affirmation of those rulings on September 12, 1996. *See, GGF v. Hyatt*, 95 F.3d 291; *GGF v. Hyatt*, 166 F.R.D. 321; *Hyatt v 35 Acres*, 1997 U.S. Dist. LEXIS 1123, 1996 WL 165008. Those rulings do not bar all of Hyatt's counterclaims for a number of reasons. When this Court dismissed Hyatt's lawsuit and denied Hyatt's request to file an amended complaint, the Court made it clear that Hyatt should instead file any meritorious claims (*i.e.,* different claims from those found deficient in Civil No. 1995-68) as counterclaims in this action. Thus, to the extent Hyatt's counterclaims represent meritorious counterclaims which sufficiently state a claim based upon the new allegations, and to the extent they are not the same claims that have been disposed of by this Court and affirmed by the United States Court of Appeals for the Third Circuit, they will not be barred by res judicata, collateral estoppel or law of the case. These circumstances do not present the typical situation where a party files a complaint which is dismissed, and then tries to file a new case based upon the same factual allegations. In that situation the entire second lawsuit may be barred, even claims that were not raised in the first lawsuit. In this instance, when Hyatt's lawsuit was dismissed, a related, consolidated lawsuit was pending based upon the same set of events. For efficiency's sake, this Court

---

[3] Hyatt does not allege any counterclaims against the other plaintiffs, namely 12 Acres Associates and Benefori Oy.

directed Hyatt to assert any meritorious claims as counterclaims in that pending case. For that reason, the Court will not apply the doctrines of res judicata, collateral estoppel and law of the case to bar all of Hyatt's counterclaims.

### 3. D'Oench, Duhme Doctrine

The Skopbank Parties second argument for dismissing Hyatt's counterclaim in its entirety is based upon the D'Oench, Duhme doctrine, which originated as a federal common law rule designed by the Supreme Court to protect the *Federal Deposit Insurance Corporation ("FDIC"). D'Oench, Duhme & Co. v. Federal Deposit Ins. Co.*, 315 U.S. 447, 459, 86 L. Ed. 956, 62 S. Ct. 676 (1942). The doctrine has since been partially codified by the Federal Deposit Insurance Corporation Act, 12 U.S.C. §§ 1823 and 1829. The basic purpose of the doctrine is to prevent debtors of failed banks taken over by the FDIC from raising defenses based on "secret agreements" with the banks. However, as far as this Court can tell, this doctrine has never been applied to foreign banks taken over by foreign governmental agencies. None of the cases cited by the Skopbank Parties in their Brief in Support of Skopbank Parties' Motion to Strike and Dismiss Hyatt's First and Second Amended Counterclaims with prejudice filed November 26, 1996, apply the doctrine to a foreign bank. (Br. Supp. Mot. Strike & Dismiss, at 40-47.) This Court finds the doctrine inappropriate for this case, and addresses the merits of each counterclaim.

### 4. Sufficiency of Individual Counterclaims

The Skopbank Parties next address each of the counterclaims individually and argue why each counterclaim is deficient and should be dismissed. These arguments are more persuasive. The twelve counts of the counterclaim are as follows: (1) breach of contract against Skopbank and 35 Acres, (2) anticipatory repudiation of contract against Skopbank and 35 Acres, (3) tortious interference with contracts against Skopbank and GGF, (4) tortious interference with prospective economic advantage against Skopbank and GGF, (5) conspiracy claim against Skopbank and GGF, (6) equitable estoppel against Skopbank, (7) unjust enrichment against Skopbank and GGF, (8) breach of warranty against 35

365

Acres, (9) fraud against Skopbank, (10) breach of guaranty of payment and performance against Skopbank, (11) fraudulent conveyance against Skopbank and 35 Acres, and (12) prima facie Tort against all Counterdefendants.

Hyatt has failed to state a claim upon which relief can be granted in Count Four (tortious interference with prospective economic advantage against Skopbank and GGF), Count Five (conspiracy claim against Skopbank and GGF), Count Six (equitable estoppel against Skopbank), Count Seven (unjust enrichment against Skopbank and GGF), Count Nine (fraud against Skopbank), Count Eleven (fraudulent conveyance against Skopbank and 35 Acres) and Count Twelve (prima facie tort against all counterdefendants.) In addition, Count Eight (breach of warranty against 35 Acres) is merely redundant of Count One (breach of contract against Skopbank and 35 Acres) and will be stricken. Count Two (anticipatory repudiation of contract against Skopbank and 35 Acres) is also redundant of the breach of contract claim and will be stricken. Accordingly, the only counterclaims that will remain are counts One (breach of contract against Skopbank and 35 Acres), Three (tortious interference with contracts against Skopbank and GGF) and Ten (breach of guaranty of payment and performance against Skopbank).

In reaching this conclusion, the Court applies the law of the Virgin Islands. Skopbank has suggested that the law of New York should govern this dispute, presumably because the subordination agreement contains a New York choice of law provision. (Subordination Agreement, ¶ 25.) The only counterclaim where the choice of New York over Virgin Islands law would make a difference is with respect to Hyatt's tortious interference with contractual relations. Because that counterclaim is a tort claim which is not based upon the subordination agreement, it is irrelevant that the subordination agreement contains a New York choice of law provision. Accordingly, Virgin Islands law is applied.

a. Breach of Contract (Count One)

Hyatt alleges in Count One that Skopbank breached the subordination agreement and that 35 Acres breached the management agreement. Skopbank warranted in the subordination agree-

ment that "Hyatt's Management Agreement would remain in full force and effect in the event of a foreclosure on the Resort." The Management Agreement provides in Section 3.1 that Hyatt shall manage the resort for a term of thirty years unless "the Agreement shall be terminated as herein provided." (Management Agreement at 5-6.) The management agreement provides for termination only if Hyatt is in default. (Management Agreement, §§ 4.5, 7.5.) Reading the counterclaim as a whole, Hyatt alleges (1) that Hyatt performed all of its duties and obligations under the Management Agreement and was thus wrongfully terminated by 35 Acres in breach of the management agreement and (2) that Skopbank induced 35 Acres to breach the management agreement and thus violated the subordination agreement. Such an allegation sufficiently states a claim for breach of contract.

b. Anticipatory Repudiation (Count Two)

■ Hyatt's second count for anticipatory repudiation of contract against Skopbank and 35 Acres is merely redundant of the first count and unnecessary. When a party to a contract breaches that contract by anticipatory repudiation, such a breach excuses the other party from having to perform its part of the bargain. Thus a party has a cause of action for breach of contract even though it has not performed its obligations if the reason for nonperformance is the anticipatory repudiation by the other party. See, generally WALTER H. E. JAEGER, WILLISTON ON CONTRACTS § 875 (3d ed. 1962). The concept of breach of contract by anticipatory repudiation also allows the nonbreaching party to bring a claim for breach of contract before the time for performance under the contract has occurred. In this instance, Hyatt does not allege that it did not perform its part of the bargain, or that the time for performance under the relevant agreements is in the future. Indeed Hyatt alleges that it has fulfilled all of its duties and obligations under the relevant agreements, and that Skopbank and 35 Acres have wrongfully terminated Hyatt. Thus the count for anticipatory repudiation of contract serves no useful purpose. It will therefore be stricken.

c. Breach of Warranty (Count Eight)

Hyatt alleges a breach of warranty claim against 35 Acres in Count Eight of its counterclaim. This count is also redundant of

Hyatt's breach of contract claim and will be stricken. Hyatt claims that in section 7.5 of the Management Agreement, the owner warrants "that this Agreement shall not be subject to forfeiture or termination except in accordance with the provisions hereof," and further warrants that "so long as Hyatt shall not be in default hereunder, Hyatt shall be entitled to operate the Hotel for the Term, and Owner shall, at no expense to Hyatt, undertake and prosecute all appropriate actions, judicial or otherwise, required to assure such right of operation to Hyatt." (Counterclaim, ¶ 95, quoting Section 7.5.) Hyatt contends that 35 Acres has breached this warranty by "(a) purporting to terminate the Management Agreement; (b) initiating and prosecuting in this Court the above-captioned action; and (c) failing to defend Hyatt and pay Hyatt's attorneys' fees in connection with the above-captioned action." (Counterclaim ¶ 96.) Hyatt seeks damages and "the payment of its reasonable attorneys' fees incurred in this action." (Counterclaim ¶ 97.)

In this count, Hyatt alleges that the act of bringing this lawsuit against Hyatt is a breach of 35 Acres' warrant to "undertake and prosecute all appropriate actions, judicial or otherwise, required to assure such right of operation by Hyatt." This Court finds that Section 7.5 cannot possibly be interpreted as prohibiting 35 Acres from suing Hyatt for breach of contract. Under Hyatt's theory, Hyatt could breach the management agreement at will and 35 Acres would be without legal recourse. It would be similarly absurd to read this provision as requiring 35 Acres to defend Hyatt against its lawsuit against Hyatt. If Hyatt proves that its termination was in violation of the provisions of the management agreement, than Hyatt will prevail on Count One, its breach of contract claim. The fact that section 7.5 may also be violated would be redundant and without additional legal consequences. For the above reasons, this count is dismissed.

d. Breach of Guaranty of Payment and Performance (Count Ten).

In Count Ten, Hyatt alleges that Skopbank guaranteed the payment and performance of all financial obligations under the management and transition agreements, that Hyatt fulfilled all of its duties and obligations under the agreements, and that Great

Cruz failed to meets its obligations to Hyatt. Hyatt claims that Skopbank thus "is liable to Hyatt to fulfill all of the guaranty obligations which were and remain subject to default." (Counterclaim ¶ 110.) This count sufficiently states a claim for breach of the guaranty.

e. Tortious Interference with Contracts Against Skopbank and GGF (Count Three)

In its third count, Hyatt alleges that Skopbank and GGF have tortiously interfered with Hyatt's contractual relations with 35 Acres, namely that Skopbank and GGF "intentionally procured the breach" of the management agreement and "related agreements," and that they "clearly [had] no privilege or right to engage in such conduct." (Counterclaim, ¶ 68).

The Restatement (Second) of Torts [hereinafter "second restatement"], which governs this case, provides:

> ■ One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

RESTATEMENT (SECOND) OF TORTS, § 766 (1979). In order to state a cause of action for a tort under this section, one must allege that there was an existing contract, that the alleged tortfeasor had knowledge of the existing contract, that the alleged tortfeasor's actions were the proximate cause of the third person's failure to perform, and that the tortfeasor's actions were intentional, improper, and caused damages. Hyatt has clearly alleged the existence of a contract, knowledge of the contract by Skopbank and GGF, and proximate causation of 35 Acres' breach of the contract and damages. Hyatt has also alleged in a conclusory fashion that Skopbank and GGF's actions were wrongful.

■ The second restatement makes clear with the use of the word "improper" that not all interference with contracts or prospective contractual relations are tortious. The second restatement sets out

some of the factors that should be balanced to determine whether the alleged conduct is improper, without giving any guidance on which party has the burden on each factor. The factors for determining impropriety include: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the societal interests in protecting the freedom of action of the actor and the contractual interests of the other, and (g) the relations between the parties. RESTATEMENT (SECOND) OF TORTS, § 767.

■ The nature of the actor's conduct is most important. Without regard to factors (b) through (g), intentional interference with contractual relations is improper if the means used are independently wrongful. RESTATEMENT (SECOND) OF TORTS, § 767 cmt. d.[4] Even if the means used to interfere with the contract are not wrongful in and of themselves, an actor may still be liable if the other factors weigh heavily in favor of imposing liability. For example, if the actor's primary motive was a desire to interfere with the other's contractual relations, and the actor was not promoting any legitimate business or socially useful interest, the interference could be deemed improper. As one comment states "if the means used by the actor are innocent or less blameworthy, the desire to accomplish the interference may be more essential to a holding that the interference is improper." RESTATEMENT (SECOND) OF TORTS, § 767 cmt. d at 33.

Courts following the second restatement are divided whether a plaintiff must show impropriety as part of its prima facie case.[5] When the Restatements do not provide clear guidance with respect

---

[4]Comment d of § 767 of the Restatement (Second) of Torts provides in part:

> If the conduct is independently wrongful — as, for example, it is illegal because it is in restraint of trade or if it is tortious toward the third person whose conduct is influenced — the desire to interfere with the other's contractual relations may be less essential to a holding that the interference is improper.

[5]*See, e.g.* W. PAGE KEETON ET. AL., PROSSER AND KEETON ON THE LAW OF TORTS § 129, at 983-84 (5th ed. 1984) and cases cited therein:

> Under [the Restatement (Second) of Torts], the defendant is subject to liability for a knowing or purposeful interference with contract only if the defendant's action was "improper," either as to means or purpose. This formula might be read, as some of the cases imply, to put the burden on the plaintiff in the first instance to

to a rule of law, and there is a split in authorities, this Court is instructed to follow the sounder rule. *Polius v. Clark Equipment Co.,* 802 F.2d 75 (3d Cir. 1986). Placing the burden upon the complainant to prove a prima facie case of the alleged tortfeasor's improper conduct is the sounder rule, which this Court adopts.[6] The adoption of this rule is consistent with the recognition in the second restatement that "factual patterns develop and judicial decisions regarding them also develop patterns for holdings that begin to evolve crystallized privileges or rules defining conduct that is not improper." RESTATEMENT (SECOND) OF TORTS, § 767 cmt. b at 28.[7] This Court accordingly inquires whether the facts alleged by Hyatt, and all reasonable inferences therefrom, support Hyatt's conclusory assertion that the acts of interference by Skopbank and GGF were improper.

In this case, Hyatt does not allege any independently wrongful conduct on the part of Skopbank or GGF. Thus to the extent Hyatt's tortious interference count depends upon the allegation that Skopbank and GGF's conduct was wrongful, the count must fail. Moreover, Skopbank's act of foreclosing on the hotel was not an act of improper interference with Hyatt's contractual rights. Independently wrongful conduct means conduct that is either illegal or tortious. In the instant case, Hyatt has alleged no conduct of Skopbank and GGF that can be construed as independently wrongful. As this Court noted before in discussing Hyatt's civil conspiracy count in Hyatt's dismissed suit against 35 Acres:

---

show impropriety, and it is no doubt an improvement when so read. But the Second Restatement refused to take a clear position on the point and other cases have left the burden upon the defendant to justify his conduct.

[6] *See, e.g. Windsor Securities, Inc. v. Hartford Life Ins.,* 986 F.2d 655, 663 (3d Cir. 1993) (construing Pennsylvania law and applying the second restatement and holding that plaintiff "had the burden of establishing (1) a contractual relationship; (2) [defendant's] intent to harm [plaintiff] by interfering with contractual relations; (3) the impropriety of the interference; (4) harm resulting from the conduct."); *Wagenseller v. Scottsdale Memorial Hospital,* 147 Ariz. 370, 388, 710 P.2d 1025, 1043 (1985) (construing the Restatement (Second) of Torts and holding that plaintiff "must show that the defendant acted improperly. . . . If the plaintiff is unable to show the impropriety of the defendant's conduct based on an examination of the [factors listed in § 767], the conduct is not tortious.").

[7] Sections 768-774 of the Restatement (Second) of Torts are a non exhaustive list of specific factual situations where it is settled that the interference is not improper.

> Hyatt, however, alleges no unlawful acts committed by 35 Acres or Skopbank in furtherance of their attempt to oust Hyatt, but merely alleges that Skopbank foreclosed on the hotel, 35 Acres bid for it at the marshal's sale, and 35 Acres sent letters to Hyatt terminating the management agreements. Describing such actions using hyperbolic language intended to cast a sinister pall over a simple business transaction, and peppering the complaint with irrelevant and prejudicial facts about other unrelated lawsuits, does not alter the fact that Hyatt has alleged no unlawful actions on the part of 35 Acres or Skopbank.

*Hyatt v. 35 Acres*, 1996 WL 165008 at * 6. Although Hyatt has toned down the hyperbolic language and omitted reference to unrelated lawsuits in its second amended counterclaim, its factual allegations are the same, and, as such, still do not assert any improper conduct on the part of any of the counterdefendants.

Nor can Hyatt allege that Skopbank's breach of any of its contracts with Hyatt constitutes improper conduct by itself. The United States Court of Appeals for the Third Circuit rejected such an argument in *Windsor Securities, Inc. v. Hartford Life Ins.*, 986 F.2d 655, 663 (3d Cir. 1993). In Windsor the plaintiff argued that the defendant's conduct was "independently wrongful" because it constituted a breach of contract. The Court of Appeals stated that "'wrongful' conduct requires something more than mere breach of contract. . . . Breach of contract, without more, is not a tort. . . . Breach of contract is not 'illegal' either under common usage or under comment d to § 767." *Id.* at 664. Thus the fact that Skopbank's action of inducing 35 Acres to breach 35 Acres' contracts with Hyatt may in itself constitute a breach of Skopbank's contractual duties under the subordination agreement does not rise to the level of "independently wrongful" conduct.

Hyatt's count is nonetheless sufficient if construed as alleging that the conduct of Skopbank and GGF in creating 35 Acres and inducing 35 Acres to breach the management agreement was motivated primarily by a desire to interfere with Hyatt's contractual rights and did not serve any legitimate business or social interests. Hyatt's counterclaim can be read as alleging several acts of interference by Skopbank and GGF, namely, (1) foreclosing

Skopbank's mortgages on the hotel, (2) allowing 35 Acres, an entity controlled by Skopbank and GGF, to purchase the hotel, and inducing 35 Acres to terminate the management agreements. This Court finds that the first alleged act of interference cannot form the basis for tort liability as a matter of law even when reading the counterclaim in a light most favorable to Hyatt. However, Hyatt has sufficiently stated a claim for tortious interference with contractual relations with respect to the second group of alleged acts of interference.

Taking the allegations in sequence, Hyatt first alleges that Skopbank "conceived a scheme by which it would bolster its own troubled portfolio by seizing the value of the project for itself. . . ." and "desirous of seizing Great Cruz's interests in the 'Hyatt Regency St. John,' Skopbank initiated proceedings to foreclose on the Resort, which secured its loans to Great Cruz . . . ." (Counterclaim ¶ 43.) Hyatt seems to be trying to imply that Skopbank's act of foreclosing on the hotel was done for the primary purpose of interfering with Hyatt's contractual rights under the management and other agreements in favor of Skopbank's own economic interests. Assuming arguendo that Skopbank was motivated to foreclose by a desire to see Hyatt terminated as manager of the hotel and assuming that such foreclosure was a proximate cause of Hyatt's termination, this Court finds that, as a matter of law, Skopbank's action in foreclosing its mortgages on the hotel did not constitute an improper interference with Hyatt's contractual rights. The foreclosure action, Civil Number 1991-355, was overseen by another judge of this Court,[8] and it is clear from the record of that proceeding that Skopbank foreclosed to protect its own substantial and legitimate business interests. Hyatt acknowledges in its counterclaim that Skopbank loaned over one hundred million dollars to the owner of the hotel and that Great Cruz consistently was unable to meet its mortgage obligations.

■ A lawful foreclosure action instituted by a lender upon default by a borrower cannot be considered "improper" simply

---

[8] Stanley S. Brotman, Senior District Judge for the District of New Jersey, sitting by designation.

because such an action may have the effect of interfering with the borrower's contracts with third persons. There is no tort liability when an actor acts to protect legitimate and prior property or contract interests of his own. *See, e.g., Windsor,* 986 F.2d at 665 ("Our cases accord substantial deference to defendants whose conduct, despite its conflict with plaintiff's interest, protects an existing legitimate business concern."); *Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1388 (3d Cir. 1991) (relying on Restatement (Second) of Torts § 767(d) in holding no tortious interference when defendant had acted to protect its own contractual interest); W. PAGE KEETON ET. AL., PROSSER AND KEETON ON THE LAW OF TORTS § 129, at 983 (5th ed. 1984). Thus the foreclosure action which resulted in 35 Acres purchasing the property cannot be construed as "improper" interference with Hyatt's contractual rights because Skopbank was clearly acting to protect its own legitimate interests relating to the hotel.

■ All that remains of the third count of the counterclaim is Hyatt's allegation that GGF and Skopbank created 35 Acres, which they controlled and then wrongfully induced to terminate the management agreement. Granting Hyatt all reasonable favorable inferences from the alleged facts, this basis for Count Three cannot be disposed of on a Rule 12(b)(6) motion to dismiss. Nevertheless, Hyatt can only prevail on this count if it can prove that GGF and Skopbank acted for the primary purpose of interfering with Hyatt's contractual relations and for no legitimate business purpose. Skopbank had a contractual right to assign its interest in the hotel to a third party. Hyatt must prove that this assignment of the interest to 35 Acres was done for no legitimate business purposes and for the primary motive of interfering with Hyatt's contractual rights. The other elements for tortious interference must also be met. Moreover, many courts have held that when a parent corporation induces a wholly owned subsidiary to breach a contract, such inducement is not improper if the parent corporation does not employ improper means and acts for legitimate business purposes,

for example, to protect its subsidiary from a bad bargain.[9] *E.g., Green v. Interstate United Management Services Corp.*, 748 F.2d 827, 830 (3d Cir. 1984).

In *Green*, the defendants instructed their wholly-owned subsidiary not to sign a lease tendered by the plaintiff real estate broker after an appraiser had determined that the contract was a bad bargain. The court determined that the defendants' "motive, plainly, was to prevent dissipation of the resources of their wholly-owned subsidiary. In this case 'the social interests in protecting the freedom of the actor' outweigh 'the contractual interests of the other.'" *Id.* at 831 (quoting RESTATEMENT (SECOND) OF TORTS, § 767(e)). 35 Acres is a partnership consisting of two corporations wholly-owned by Skopbank. Skopbank is majority-owned and controlled by GGF. *See, infra,* 34-35. Thus the relationships among Skopbank, GGF and 35 Acres makes the rule regarding parent corporations' conduct with subsidiaries applicable. However, according to Hyatt's allegations, the hotel was flourishing under the management of Hyatt and, thus, we cannot conclude on this record that the management agreement was a "bad bargain" which Skopbank and GGF were justified in inducing 35 Acres to breach.

f. Tortious Interference with Prospective Economic Advantage Against Skopbank and GGF (Count Four)

In Count Four, Hyatt alleges tortious interference with prospective economic advantage against Skopbank and GGF, a tort recognized by the second restatement. RESTATEMENT (SECOND) OF TORTS, § 766B.[10]

---

[9] *See, e.g. Boulevard Associates v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1036 & n.3 (2d Cir. 1995) (listing authorities to support statement that "other states have uniformly found that a parent company does not engage in tortious conduct when it directs its wholly-owned subsidiary to breach a contract that is no longer in the subsidiary's economic interest to perform.")

[10] Section 766B of the Restatement (Second) of Torts provides:

One who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from the loss of the benefits of the relation, whether the interference consists of

Hyatt alleges that it

> reasonably anticipated and expected prospective economic advantages stemming from, inter alia, its interests in and management of the Resort business. Those prospective economic advantages included, without limitation: the benefits to the Hyatt chain resulting from the Resort's membership therein, the additional contractual relationships which would inevitably have been formed absent counterdefendants' interference, and the future fees and other benefits flowing from Hyatt's continued, unimpeded participation in the business.

Complaint, ¶ 73. The prospective economic advantages described in this count are merely the same benefits that Hyatt would have derived from the management agreement, with the possible exception of "additional contractual relationships which would inevitably have been formed absent counterdefendants' interference." Accordingly, in most respects, this count is merely duplicitous of Count Three. Obviously, when the management agreement was terminated Hyatt lost "the benefits to the Hyatt chain resulting from the Resort's membership therein," as well as the "future fees and other benefits flowing from Hyatt's continued, unimpeded participation in the business." Labeling such as losses of "prospective economic advantage" does not transform the tort of intentional interference with contracts into the separate tort of intentional interference with prospective contractual relations.

Hyatt does allege that Skopbank and GGF's actions interfered with "the additional contractual relationships which would inevitably have been formed absent counterdefendants' interference." Such a vague allegation is insufficient to withstand a motion to dismiss, however. The existence of "a sufficiently concrete prospective contractual relation" is an essential element of the tort of intentional interference with prospective contractual relations. *See Fineman v. Armstrong World Industries, Inc.*, 980 F.2d 171, 195 (3d Cir.

---

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

376

1992) (construing New Jersey law which follows section 766B of the Restatement (Second) of Torts). In *Fineman*, the Court of Appeals held that the plaintiff, an industry consultant, had failed to prove this element even though "the record was replete with evidence of Fineman's fine reputation as an industry consultant, it was devoid of objective evidence that Fineman had any concrete plans for future consulting work." *Id.* at 195. Nowhere in its counterclaim or opposition to the motion does Hyatt point to any concrete or even vaguely specific future contracts that were allegedly interfered with by Skopbank and GGF.

Assuming the supposed future hypothetical contractual relations consist of the typical contracts Hyatt would have entered into as the hotel owner's agent manager, the count is still insufficient. Those types of contracts, for example, contracts for services or supplies needed by the hotel, would have been entered into for the benefit of the owner. The only benefit to Hyatt as agent from such future contracts would have been that such contracts might have improved the overall performance of the hotel which would in turn have resulted in higher fees to Hyatt under the management agreement. Any losses attributable to the loss of such future contracts would thus be the same losses attributable to Hyatt's loss of the benefits under the management agreement as a result of the termination. Accordingly, such future contractual relations do not support a separate tort claim. For the above reasons, Hyatt's fourth count is dismissed.

g. Conspiracy Against Skopbank and GGF (Count Five).

Under Virgin Islands law, a civil conspiracy "'consists of an agreement or combination to perform a wrongful act that results in damage to the plaintiff.' A conspiracy may also consist of an agreement to do a lawful act by unlawful means." *Hyatt v. 35 Acres*, 1996 WL 165008 at * 4 (quoting *Cooper v. Vitraco, Inc.* 320 F. Supp. 239, 242-43 (D.V.I. 1970)). Hyatt alleges in Count Five that

> Skopbank and GGF, with the willing participation of Stanton and 35 Acres, entered into a combination and conspiracy for the purpose of unlawfully interfering with Hyatt's rights and interests in: (a) the business known as the "Hyatt Regency St. John;" (b) the Management Agree-

ment; and (c) the Transition Agreement. Skopbank, GGF and Stanton also entered into a conspiracy to fraudulently transfer assets beyond the reach of Hyatt and for the purpose of depriving Hyatt of its rights under the Management Agreement.

As discussed above, Hyatt has not alleged any unlawful means employed by Skopbank, GGF or 35 Acres. Assuming that tortiously interfering with Hyatt's contractual rights and fraudulently transferring assets beyond the reach of Hyatt are unlawful objectives for which one could be held liable for conspiring to do, Hyatt's count still fails because, as a matter of law, GGF, Skopbank and Michael Stanton cannot conspire with each other.

██ The essence of a civil conspiracy is two or more persons agreeing in some form and acting on a desire to accomplish an unlawful end. Many courts have held that a parent corporation and its wholly owned subsidiary cannot conspire for purposes of a civil conspiracy claim based on the Supreme Court decision in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 81 L. Ed. 2d 628, 104 S. Ct. 2731 (1984).[11] The *Copperweld* Court held that, for purposes of Sherman Act liability, a parent corporation and its wholly-owned subsidiary cannot conspire with each other. The Supreme Court explained that

> [a] parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate conscious-

---

[11] *See, e.g. Siegel Transfer, Inc. v. Carrier Express, Inc.*, 856 F. Supp. 990, 1009 (E.D.Pa. 1994) ("It is well-settled that a corporation cannot conspire with its subsidiaries, its agents or its employees for the same reasons the Copperweld Court found such a conspiracy to be legally impossible in the antitrust conspiracy context.") *aff'd* 54 F.3d 1125 (3d Cir. 1995); *Pizza Management, Inc. v. Pizza Hut, Inc.*, 737 F. Supp. 1154, 1165 (D. Kan. 1990) (parent corporation cannot conspire with its subsidiary for purposes of civil conspiracy liability); *Laxalt v. McClatchy*, 622 F. Supp. 737, 745-46 (D. Nev. 1985) (wholly owned subsidiaries have no separate legal existence for civil conspiracy claims); *In re Ray Dobbins Lincoln-Mercury, Inc.*, 604 F. Supp. 203, 204-05 (W.D.Va. 1984), *aff'd*, 813 F.2d 402 (4th Cir. 1986); *Ford Motor Co. v. Lyons*, 137 Wis. 2d 397, 405 N.W.2d 354 (Wis. App. 1987) (parent corporations cannot conspire with subsidiaries to injure another's reputation, trade, business or profession); In re: *Asbestos Litigation*, 509 A.2d 1116 (Del.Super.Ct. 1986) (parent corporation cannot conspire with its subsidiary for purposes of civil conspiracy liability), *aff'd*, 525 A.2d 146 (Del. 1987).

ness, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver.

*Id.* at 771.

One court has explained the reason for extending the rationale in *Copperweld* to the tort of conspiracy:

> A [civil] conspiracy, by itself, is not actionable: there must be harm or injuries resulting from it and from conduct independently actionable. Where the alleged harm and motives are mostly economic in nature and the overt acts primarily attributable to the wholly owned subsidiary, a civil conspiracy claim in almost all circumstances would also exist against the parent corporation. By the very nature of their relationship, the parent corporation and its wholly owned subsidiary have shared goals, particularly economic ones, since "the subsidiary acts for the benefit of the parent, its sole shareholder." If a civil conspiracy claim was actionable under these circumstances, the stricter burdens governing the alter ego doctrine and the policy value reflected in those burdens would be readily circumvented.

*Pizza Management, Inc. v. Pizza Hut, Inc.,* 737 F. Supp. 1154, 1166 (D. Kan. 1990) (quoting Copperweld, 467 U.S. at 771).[12]

The relationship between Skopbank and GGF is sufficiently like that of parent corporation and wholly owned subsidiary for this Court to apply the *Copperweld* rationale. Although in its counter-claim Hyatt does not make any allegations concerning the relation-ship between Skopbank and GGF,[13] that relationship was litigated

---

[12] This same reasoning makes a conspiracy between Skopbank, GGF and Michael Stanton, an executive of Skopbank, a legal impossibility. Given 35 Acres status as a wholly-owned subsidiary of Skopbank, there also can be no conspiracy between Skopbank, GGF and 35 Acres.

[13] Hyatt merely alleges that "Skopbank is a banking corporation organized and existing under the laws of the Republic of Finland, which has its principal place of business in Helsinki, Finland," and that "GGF is organized and existing under the laws of the Republic of Finland, which has its principal place of business in Helsinki, Finland." (Counterclaim, ¶¶ 3, 4.)

in the Southern District of New York in the related action of *Hyatt Corp. v. Stanton*, 945 F. Supp. 675. In ruling to remand the case back to state court, the district court concluded the following from the complaint, affidavits and exhibits submitted by the parties concerning the relationship of Skopbank and GGF:

> Skopbank is a savings institution, incorporated and headquartered in Finland, with an office in New York City.
>
> . . .
>
> On September 19, 1991, the Bank of Finland took control of Skopbank, assuming ownership of 52.9% of its total stock and 63.59% of its voting stock. The Bank of Finland is the "national central bank" of Finland and is under control of the Finnish Parliament. It owned its shares in Skopbank through a wholly-owned subsidiary, Scopulus Oy.
>
> On June 15, 1992, Finland's Government Guarantee Fund ("GGF") purchased all of Scopulus Oy's shares in Skopbank. The GGF was created by the Finnish Parliament. Its "mission . . . is to safeguard the activities of [Finnish] deposit banks and claims of depositors. The GGF has been provided with extensive powers to grant bank support and deal with the bank crisis in Finland." Skopbank is currently controlled by GGF, which owns 52.9% of its total stock and 62.59% of its voting stock.

*Hyatt Corp. v. Stanton*, 945 F. Supp. at 677 (citations to affidavits and exhibits omitted). Because Skopbank is majority-owned and controlled by GGF, the two entities are incapable of conspiring with one another.

Courts have found the rationale of *Copperweld* applicable even when the subsidiary is not one hundred percent owned by the parent corporation. *See, e.g. Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1133 & n. 7 (3d Cir. 1995). The court in *Siegel* noted that *Copperweld* encouraged "the court to analyze the substance, not the form, of economic arrangements when faced with allegations of intra-corporate conspiracies." *Id.* at 1132. That the parent corporation defendant owned less than one hundred percent of the subsidiary defendant did not change the fact that the

parent had "complete control" over the subsidiary. *Id.* at 1133. The court also noted that the *Copperweld* rationale has been applied where there was more than de minimis deviations from 100% ownership. *Id.* at n. 7. Accordingly, the fact that GGF owns less than one hundred percent of Skopbank does not change the economic reality that GGF controlled the economic affairs of Skopbank and therefore Skopbank and GGF cannot be liable for civil conspiracy, as a matter of law.

h. Equitable Estoppel Against Skopbank (Count Six)

Equitable estoppel is an affirmative defense which operates to "prohibit a party from subjecting another party to loss or injury when the other party has been led by the first party to do something which it otherwise would not have done. The doctrine of equitable estoppel forbids that party from disappointing the expectation acted upon by the other party." *Billman v. Alley Assocs.,* Civ. Nos. 79-197, 81-122, at 7 (D.V.I. May 3, 1983) (published on CD-ROM, Michie's Virgin Islands Law on Disc) (citing *New England Fish Co. V. Western Pioneer, Inc.,* 509 F. Supp. 865 (W.D.Wash. 1981)), *rev'd on other grounds,* 743 F.2d 1021 (3d Cir. 1984). Equitable estoppel is inapplicable here and Count Six will be dismissed.

The first element of equitable estoppel is a representation of some kind made by the party to be estopped which "often consists of some verbal statement . . . that something is true or not true contrary to the actual facts and the estoped party's later claim." *Id.* The second element is an "intention or expectation that one's conduct shall be acted upon by, or influence, the party seeking estoppel." *Id.* at 11. The third element is full knowledge by the party sought to be estopped of the true facts at the time of the representation. *Id.* at 12. Finally, the party claiming estoppel "must have, as a result of the other party's conduct, acted or failed to act so that his position was changed in such a way that he will suffer injury if the other party is not estopped," and the party claiming estoppel must not have had knowledge of the misrepresented facts. *Id.* at 13.

In this case, Hyatt alleges that Skopbank represented that the agreements created a business known as the "Hyatt Regency St.

John," and that Hyatt had an irrevocable interest in that business. Hyatt wants this Court to declare that Skopbank is "equitably estopped from denying the negotiation, formation, and continued existence of the business . . . and of Hyatt's irrevocable interests therein." (Counterclaim ¶ 86.) Hyatt alleges that it relied on Skopbank's representations when it "invested and participated in the business known as the 'Hyatt Regency St. John' and . . . executed the various contracts between and among the parties." (Counterclaim ¶ 83.) Hyatt further alleges that at the time Skopbank requested Hyatt to release funds to settle the foreclosure action, the bank represented that the "Hyatt's position as manager of the Resort and interests in the 'Hyatt Regency St. John' business would not be disturbed." (Counterclaim ¶ 84.) Hyatt alleges that it relied on that representation and released the funds to its detriment.

With respect to Hyatt's allegations that Skopbank should be equitably estopped from denying the existence of a business known as the Hyatt Regency St. John, the only remedy available to Hyatt would be any damages flowing from its termination as a "participant," i.e., manager of the Hyatt Regency St. John. The Court has already determined that Hyatt is not entitled to be reinstated as the hotel manager for the reasons set forth in this Court's Memoranda dated January 8, 1996, and April 10, 1996. *GGF v. Hyatt*, 166 F.R.D. at 326-330; *Hyatt v. 35 Acres*, 1996 WL 165008 at * 2-4; *see also GGF v. Hyatt*, 95 F.3d at 299-307. In essence this count is no different from Hyatt's breach of contract counterclaim, for which it claims the same damages. This count is thus unnecessary and must be dismissed.[14]

 Count Six is dismissed for the additional reason that to the extent the counterclaim is based upon verbal statements or promises made by Skopbank that were not memorialized in the March

---

[14] It would be an absurd result if Skopbank could be equitably estopped from asserting its rights under the March 1990 Agreements. If Hyatt was in default under the management agreements, then Hyatt was rightfully terminated. If Hyatt was not in default, then Hyatt was wrongfully terminated, and is entitled to damages. That is the essential dispute.

1990 Agreements, it violates the parol evidence rule.[15] The agree-
ments executed in March 1990 represent the entire agreement
between the parties which cannot be altered by prior oral repre-
sentations. Because such parol evidence is not admissible, the
counterclaim fails to state a claim to the extent it relies on
inadmissible statements.

Hyatt also bases its equitable estoppel claim on alleged promises
made by Skopbank which induced Hyatt to release "substantial
Resort funds." Skopbank counters that "because Hyatt was al-
ready required by [the] Management Agreement [section] 4.6 to
release the monies to Great Cruz and Skopbank, that action cannot
support an equitable estoppel claim." (Skopbank Parties' Br. Supp.
Mot. Dismiss or Strike 3rd, 4th, 5th, 6th, 7th, and 9th Counterclaims
filed May 24, 1996 at 28.) Skopbank cites authority for the
proposition that no equitable estoppel claim will lie for action
taken consistent with a contractual obligation. *U.S. West Financial
Services, Inc. v. Tollman*, 786 F. Supp. 333, 343-44 (S.D.N.Y. 1992).
Section 4.6 of the management agreement, entitled "Priorities of
Payment," provides for the priority for the distribution of the
amount of positive hotel cash flow, if any. Hyatt's incentive fees are
paid first, then the owner's base debt is paid, then Hyatt's
additional fees, if any, then Hyatt's loans to the owner, if any, and
finally the remainder is paid as remittance to the owner. Hyatt has
not set forth in the complaint, nor is it ascertainable from section
4.6, that Hyatt in fact was not contractually required to release the
monies to Skopbank and Great Cruz. Hyatt has not claimed that
those substantial Resort funds belonged to Hyatt. Hyatt bears the
burden of clearly stating how its reliance on Skopbank's represen-
tations caused it harm, but has provided no specifics. Even
assuming that Hyatt released the monies in reliance upon
Skopbank's alleged promises that the management agreement
would not be disturbed, Hyatt has not clearly stated how the
release of these monies caused injury to Hyatt, especially since

---

[15] *See Dubery v. Dubery*, 24 V.I. 54, 61 (Terr. Ct. 1988) ("The parol evidence rule precludes
avoidance of a contract on the basis of putative prior oral agreements which vary or
contradict the contract terms."); Restatement (Second) of Contracts, § 215 ("evidence of
prior or contemporaneous agreements of negotiations is not admissible in evidence to
contradict a term of the writing.").

there is no claim that the money belonged to Hyatt. Because Hyatt has not sufficiently alleged how it was harmed by having released the monies to settle the foreclosure action, Count Six will be dismissed in its entirety.

i. Unjust Enrichment Against Skopbank and GGF (Count Seven)

Hyatt's seventh count alleges that

[t]he conduct of counterdefendants in causing an insolvent, judgment-proof shell entity to acquire title to the Resort, burdened with Skopbank's judgment lien, exceeding the property's value, was designed to avoid their significant contractual obligations to Hyatt. Should 35 Acres be unable to satisfy any judgment rendered against it on any one of Hyatt's counterclaims, Skopbank and GGF will be unjustly enriched.

(Counterclaim ¶¶ 88-89.) Even if true, this allegation does not state a claim for unjust enrichment.

■ The elements for unjust enrichment are that the defendant was enriched, that such enrichment was at the plaintiff's expense and that the circumstances were such that in equity and good conscience the defendant should return the money or property to the plaintiff. *Axel Johnson, Inc. v. Arthur Andersen & Co.*, 830 F. Supp. 204, 211 (S.D.N.Y. 1993); *see also Bank of America, N.A. v. Moyer*, 18 V.I. 220, 224 (Terr. Ct. 1982). Hyatt has not alleged that Skopbank has been enriched at Hyatt's expense. Hyatt simply alleges that if it should be awarded judgment against 35 Acres, then Skopbank and GGF will be unjustly enriched "when the shell entity 35 Acres is left insolvent and unable to satisfy a judgment rendered in favor of Hyatt." However, no claim of unjust enrichment lies for "hypothetical future liabilities." *Axel Johnson*, 830 F. Supp. at 211-12.

This claim is also deficient because it is premised upon the notion that Skopbank should not have allowed 35 Acres to purchase the hotel. Hyatt does not contend, however, that Skopbank had a legal duty to acquire the hotel for itself. Moreover, that Skopbank has a judgment lien on the hotel and may recover on it should 35 Acres sell the hotel, does not unjustly enrich

Skopbank and GGF. There is no dispute that Skopbank loaned over $ 120 million secured by mortgages on the hotel that are superior to any right of Hyatt under the management agreement.[16] The only claims Hyatt has against 35 Acres remaining after the disposition of Hyatt's counterclaims in this memorandum is a breach of contract claim. Even if Hyatt were to prevail on this breach of contract claim and obtain a judgment against 35 Acres, such a judgment would not entitle Hyatt to a lien on the property superior to Skopbank's judgment lien. Skopbank's potential recovery on collateral for money loaned simply cannot support a claim for unjust enrichment. *See Millers National Ins. Co. v. Commercial Credit Business Loans, Inc.*, 893 F.2d 165, 169 (8th Cir. 1990) (where lender lawfully acquired proceeds of loan from borrower's trustee in bankruptcy ahead of another creditor who disputed priorities, creditor had no unjust enrichment claim against lender). Accordingly, Hyatt's unjust enrichment claim will be dismissed.

j. Fraud (Count Nine)

Hyatt alleges in Count Nine that

> [b]y its promises and representations that Hyatt would remain as the manager of the Hotel for the duration of the Term and that the Management Agreement would not be terminated (except as might be permitted pursuant to the express terms thereof), Skopbank induced Hyatt to release a substantial amount of Resort funds to be used in settling the Foreclosure Action and Skopbank's dispute with Great Cruz. Were it not for Skopbank's promises and representations, Hyatt would not have agreed to release those monies.

(Counterclaim ¶ 99.) This count is insufficient and must be dismissed.

 An essential element of fraud is damages. Even assuming this allegation sufficiently states the other elements of fraud

---

[16] The subordination agreement provides that "the Management Agreement and any right, title, interest created thereby and the lien thereof are and at all times shall continue to be subject and subordinate in all respects to the Security Documents and to all renewals, modifications, and extensions thereof . . . ." (Subordination Agreement § 1)

namely, (1) a false representation of a material fact; (2) the speaker's intent that the statement should be acted upon; and (3) reliance upon a statement by the person claiming to have been deceived, the count insufficiently alleges damages. *See Navarro v. Government of the Virgin Islands*, 18 V.I. 473, 477 (D.V.I. 1981). As discussed above with respect to Hyatt's equitable estoppel counterclaim, Hyatt does not allege how releasing the Resort monies harmed Hyatt. Given that Hyatt does not allege that the monies belong to Hyatt, the allegations do not sufficiently demonstrate any damage to Hyatt.

The Skopbank Parties, relying on New York law, argue that the fraud count is deficient for the additional reason that Hyatt has pleaded no facts that would support a finding that Skopbank did not intend to perform at the time it made its alleged promises to Hyatt that the management agreement would not be disturbed by the foreclosure action. *Beck v. Manufacturers Hanover Trust*, 820 F.2d 46, 49-50 (2d Cir. 1987) ("Although Rule 9(b) [of Federal Rules of Civil Procedure] provides that intent and 'other condition of mind' may be averred generally, plaintiffs must nonetheless provide some factual basis for conclusory allegations of intent."); *Soper v. Simmons International, Ltd.*, 632 F. Supp. 244, 249 (S.D.N.Y. 1986) (dismissing the complaint for failure to plead any facts beyond nonperformance to support claim that defendants acted with intent not to perform their alleged promises). This Court declines to follow New York's requirement that, when the fraud allegation is based upon misrepresentation of a promise to perform, the pleadings must contain facts from which one could infer that the promisor at the time of making his promise did not intend to perform. While the circumstances constituting fraud must be pleaded with particularity under Rule 9(b) of the Federal Rules of Civil Procedure, "intent . . . and other condition of mind may be averred generally." FED. R. CIV. P. 9(b).[17] Count Nine will nevertheless be dismissed.

---

[17] Hyatt's fraud count is vague and broad and could possibly be dismissed for failing to meet the particularity requirements of Rule 9(b). FED. R. CIV. PRO. 9(b); *Saporito v. Combustion Engineering Co.*, 843 F.2d 666, 673-76 (3d Cir. 1988) ("Although the appellants' complaint does indicate the general content of the representations, . . . it does not indicate who the speakers were . . . or who received the information," and thus is insufficient under Fed.R.Civ.P. 9(b)), *vacated and remanded on other grounds*, 489

While the second restatement provides for liability for misrepresenting one's intention to perform an act or promise,[18] proof that the promisor did not perform his alleged promise, standing alone, is not sufficient for a party to prevail on such a claim.[19] *See also, Mellon Bank Corp. v. First Union Real Estate Equity and Mortgage Investments*, 951 F.2d 1399, 1409-12 (3d Cir. 1991) (construing Pennsylvania law and section 530 of Restatement (Second) of Torts, summary judgment in favor of defendant affirmed because no evidence aside from nonperformance that defendant had no intention of fulfilling promises made). Thus even if Hyatt's count were sufficient with respect to all of the elements of fraud, Hyatt could not prevail without proof beyond the fact of non-performance by Skopbank. Because we find the count deficient in allegations of any injury, the count will be dismissed.

Hyatt's fraud count contains the additional allegations that

Skopbank's actions in orchestrating the acquisition of the Resort by an insolvent shell entity — 35 Acres — constituted fraud. In creating 35 Acres and causing 35 Acres to purchase the Resort, overburdened as it was with Skopbank's own liens, Skopbank attempted to avoid assuming the owner's obligations under the Management Agreement and, instead, sought to transfer those substantial obligations to a judgment-proof puppet. That scheme, too, constituted fraud.

(Counterclaim, ¶ 103.) This allegation contains no claim of a false or misleading representation by Skopbank that Hyatt relied upon

---

U.S. 1049, 109 S. Ct. 1306 (1989). Hyatt simply alleges promises and representations with only a general description of the nature of those representations. Hyatt does not allege specifically when the alleged representations were made and by whom and to whom such representations were made. However, Skopbank does not argue that the fraud count is deficient for lack of particularity, thus we will not base our dismissal of the count on that ground.

[18] The Restatement (Second) of Torts provides that "[a] representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention." RESTATEMENT (SECOND) OF TORTS, § 530.

[19] "The intention of the promisor not to perform an enforceable or unenforceable agreement cannot be established solely by proof of its nonperformance, nor does his failure to perform the agreement throw upon him the burden of showing that his nonperformance was due to reasons which operated after the agreement was entered into." RESTATEMENT (SECOND) OF TORTS, § 530 cmt. d, at 65.

to its detriment. There is nothing fraudulent or wrong with a mortgagee seeking to avoid the ownership obligations of a defaulting mortgagor. Moreover, this allegation is identical to the wrongs alleged in Hyatt's Count Eleven, fraudulent conveyance against Skopbank and 35 Acres. Accordingly, the sufficiency of such allegations to support a tort action is addressed in the next section. Because the insertion of this allegation in Count Nine is merely duplicitous and confusing, it will be stricken.

k. Fraudulent Conveyance Against Skopbank and 35 Acres (Count Eleven).

In Hyatt's eleventh count, Hyatt alleges that because it has "meritorious claims against Skopbank and 35 Acres, Hyatt is a creditor of Skopbank and 35 Acres." (Counterclaim ¶ 112.)

> As the lienholder and the party responsible for initiating the foreclosure proceedings and sale, Skopbank effectively had the power to cause the Resort to be transferred to it. Indeed, no independent third-parties were interested in bidding on the Resort at the foreclosure sale in light of Skopbank's massive liens. But, it chose not to cause the Resort to be transferred to and acquired by Skopbank. Instead of acquiring title to the Resort upon foreclosure and thereby assuming the contractual obligations owed to Hyatt under the Management Agreement, Skopbank and its affiliates set up a shell entity, 35 Acres, to acquire title subject to a huge lien greatly in excess of the Resort's value. Thus, 35 Acres, from its inception, was unable to satisfy any judgment. As a result, Skopbank caused the Resort to be conveyed to 35 Acres with the intention to delay or defraud Hyatt.

(Counterclaim, ¶ 113.) These facts taken as true simply do not state a claim for fraudulent conveyance.

The elements of fraudulent conveyance are (1) an actual conveyance of property or assets by the debtor which (2) is made while a suit is pending or in anticipation of a lawsuit, (3) renders the transferor insolvent or greatly reduces its estate, and (4) is made for less than fair consideration. *Williams v. Vialet*, 19 V.I. 70, 72

(D.V.I. 1982). There is no fraudulent conveyance just because Skopbank had the "power to cause the Resort to be transferred to it," but chose not to acquire the hotel and instead "caused the Resort to be conveyed to 35 Acres." Skopbank was not the owner of the hotel and did not convey the hotel as owner to 35 Acres. Skopbank was the lender who foreclosed on the property because of the owner's failure to meet its mortgage obligations, which cannot be alleged as a basis for a fraudulent conveyance. Hyatt concedes that Skopbank had a choice — it could have acquired the property for itself, or it could have allowed the property to be bought by a third party at the foreclosure sale. Hyatt does not allege, nor could it charge, that Skopbank was under any legal duty to acquire the hotel for itself at the foreclosure sale. Failure to acquire a property which one is under no duty to acquire cannot constitute tortious or fraudulent conduct. Count Eleven is thus dismissed.

It should be noted that the foreclosure proceedings were presided over by this Court, Judge Brotman presiding. Hyatt participated in those proceedings, and did not protest at the time the hotel was sold to 35 Acres. Moreover, if Hyatt was dissatisfied with any assignment by Skopbank or with any new owner through foreclosure proceedings, section 8 of the subordination agreement provided the relief Hyatt bargained for with Skopbank. In the event any assignee acquiring ownership might be shown to "have a net worth, exclusive of its interest in the Hotel, of less than $ 20,000,000," then:

> for a period of thirty (30) days following Hyatt's receipt of notice of such succession, Hyatt shall have the right and option to give written notice to such party that it has elected to terminate the Management Agreement in accordance with this Section (in which event the Management Agreement shall terminate thirty (30) days following the date of such notice).

(Subordination Agreement § 8.)

l. Prima Facie Tort Against All Counterdefendants (Count Twelve).

Finally, Hyatt alleges in count twelve that "the wrongful conduct of Skopbank, GGF and 35 Acres, as described above, was intended

389

to cause Hyatt injury and harm and had the effect of causing such injury and harm." (Counterclaim ¶ 118.) Prima facie tort is recognized in the Virgin Islands and New York. The second restatement provides:

> One who intentionally deprives another of his legally protected property interest or causes injury to the interest is subject to liability to the other if his conduct is generally culpable and not justifiable under the circumstances.

RESTATEMENT (SECOND) OF TORTS § 871. However no claim lies for prima facie tort "where there is objective justification for the conduct of the alleged tortfeasor." *Avins v. Moll*, 610 F. Supp. 308, 319 (E.D.Pa. 1984), *aff'd* 774 F.2d 1150 (3d Cir. 1985). The sole motivation for the damaging acts must have been a malicious intention to injure the plaintiff. *Marcella v. ARP Films*, 778 F.2d 112, 119 (2d Cir. 1985). Moreover, no claim for prima facie tort lies if the action complained of fits within another category of tort. *See, e.g. Moore v. A.H. Riise Gift Shops*, 659 F. Supp. 1417, 1426 (D.V.I. 1987) (dismissing prima facie tort claim because plaintiff "failed to plead any facts in [the prima facie tort count] to support a claim for another tort in addition to and distinct from the two previously alleged.").

In this case, Hyatt alleges no facts of wrongful conduct to support any tort in addition to and distinct from the one tort it has sufficiently plead, namely tortious interference with contractual relations. If the alleged "wrongful conduct" is Skopbank's act of foreclosing on the property and allowing its assign, 35 Acres, a 'shell entity' to bid for the hotel, then no claim for prima facie tort lies, because, as this Court has repeatedly emphasized, such conduct is not wrongful and cannot provide the basis for imposing tort liability on Skopbank. Hyatt itself does not claim that Skopbank was under a legal duty to take possession and owner-ship of the hotel, so therefore, 'allowing' 35 Acres to bid on the hotel was not tortious. Even if allowing 35 Acres, an alleged 'shell' entity, to bid for the hotel can be characterized as "malicious and for the purpose of intentionally harming Hyatt," and there is no objective business justification for it, Hyatt still has not alleged any injury or harm, except for the possibility of a future loss if and

390

when they get a judgment against 35 Acres which they are unable to satisfy. For all of the above reasons, this count will be dismissed.

*5. Conclusion*

Based on the foregoing, all of Hyatt's counterclaims are dismissed with the exception of the counterclaims for breach of contract (Count One), breach of guaranty of payment and performance (Count Ten) and part of the tortious interference with contracts (Count Three). The Court's discussion in dismissing Hyatt's counterclaims should make clear to the parties that this dispute is essentially a contractual dispute over the propriety of terminating Hyatt as manager of the hotel. Hyatt's attempts to make tortious claims out of this alleged breach of contract have for the most part failed. Most of Hyatt's factual allegations in paragraphs one through 54 of the counterclaim are therefore irrelevant to Hyatt's counterclaims. Moreover those allegations that imply Hyatt was granted an irrevocable interest in a business known as the Hyatt Regency St. John are erroneous, given this Court's earlier rulings regarding the agency relationship created by the March 1990 agreements. However, this Court finds it unnecessary to strike such allegations under Rule 12(f) of the Federal Rules of Civil Procedure, as they do provide the context (from Hyatt's perspective) in which the March 1990 agreements were executed, and the events that occurred before Hyatt's termination.

## B. Motion to Enjoin

The second motion to be resolved is Skopbank Parties' motion to enjoin the prosecution of litigation against Michael V. Stanton ["Stanton"] and to enjoin the institution of related litigation. For the following reasons, this motion is denied at this time without prejudice to being renewed if circumstances change.

*1. Procedural Background*

On May 29, 1996, approximately two and a half months after the Skopbank Parties filed suit against Hyatt in this Court and approximately one month after Hyatt filed suit against 35 Acres in this Court, Hyatt filed a complaint against Stanton in New York State Supreme Court, New York County. This New York lawsuit

asserted three causes of action, tortious interference with contractual relationship and prospective economic advantage, prima facie tort and civil conspiracy ["the Stanton action"]. On June 7, 1996, the Skopbank Parties filed in this Court a motion for a temporary restraining order and a preliminary and permanent injunction enjoining Hyatt from proceeding with the Stanton action. Before this Court could rule, Stanton, on June 28, 1996, removed the Stanton action from state court to the United States District Court for the Southern District of New York ["Southern District"]. Hyatt thereafter filed a motion to remand to the state court. Before the Southern District ruled on the remand motion, the Skopbank Parties filed a motion in this Court on July 22, 1996 to enjoin litigation against Stanton in the Southern District. In the July 22, 1996 motion, the Skopbank Parties withdrew, without prejudice, their June 7, 1996 motion to enjoin the action in the state court.

On November 19, 1996, the Southern District granted Hyatt's motion to remand the Stanton action. *Hyatt Corp. v. Stanton*, 945 F. Supp. 675 (S.D.N.Y. 1996). Previously, during a status conference on November 8, 1996, this Court ruled that the Skopbank's parties' withdrawn motion to enjoin the New York state court proceedings automatically would be revived if Hyatt's motion to remand to the New York State court was granted. Accordingly, the Skopbank Parties' motion to enjoin Hyatt from prosecuting its suit in the New York State Supreme Court, as well as enjoining it from commencing any other litigation concerning the same subject matter in any court other than this Court is now before this Court. The relevant authorities cited in the parties' respective filings have been reviewed.

### 2. Discussion

■ The Skopbank Parties argue that this Court has authority to grant the injunction under the All Writs Act, 28 U.S.C. § 1651. They further argue that this Court is not barred from issuing such an injunction under the Anti-Injunction Act, 28 U.S.C. § 2283, because (1) the Anti-Injunction Act does not apply to this Court and (2) even if it did apply, the injunction falls under one of the exceptions to the Anti-Injunction Act. This Court agrees that the Anti-Injunction Act does not apply to this Court, but it also finds that

the principles of the Anti-Injunction Act should be followed. Applying such principles, this Court may not issue an injunction at this stage of the proceedings because none of the exceptions to the Anti-Injunction Act are applicable.

The All Writs Act states in relevant part:

(a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

28 U.S.C. § 1651 (1987). The District Court of the Virgin Islands was established by an act of Congress, 48 U.S.C. § 1611, and thus the All Writs Act is applicable.

The Anti-Injunction Act provides as follows:

A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

28 U.S.C. § 2283. The District Court of the Virgin Islands is not a court of the United States as that term is defined in 28 U.S.C. § 451.[20] *See United States v. George*, 625 F.2d 1081, 1088-89 (3d Cir. 1980) (where the reference to 'court of the United States' is to the nature of the District Court of the Virgin Islands as an institution, its classification as a territorial court prohibits treating it as a court of the United States.) Thus on its face, the Anti-Injunction Act does not apply to this Court.

■ According to the Supreme Court, the anti-injunction act's "basic purpose is to prevent needless friction between state and federal courts." *Mitchum v. Foster*, 407 U.S. 225, 232-33, 32 L. Ed. 2d 705, 92 S. Ct. 2151 (1972) (internal quotations omitted); *United States Steel Corp. v. Musisko*, 885 F.2d 1170, 1173-75 (3d Cir. 1989) (reciting historical background of the Anti-Injunction Act); 17

---

[20] Section 451 of Title 28 provides:

The term "court of the United States" includes the Supreme Court of the United States, courts of appeals, district courts constituted by chapter 5 of this title, including the Court of International Trade and any court created by Act of Congress the judges of which are entitle to hold office during good behavior.

CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4221, at 496 (2d ed. 1988). While technically not a court of the United States, the jurisdiction of the District Court of the Virgin Islands is sufficiently "federal" that this Court should be mindful of "needless friction" with the state courts in New York.[21] Thus this Court will follow the teachings of the anti-injunction act and refrain from issuing the requested injunction unless one of the well-settled exceptions to the act becomes applicable. Indeed, the anti-injunction act has been assumed to be applicable to this Court without discussion. *In re Tutu Wells Contamination Litigation*, 885 F. Supp. 776, 786-87 (J. Brotman, Senior District Judge for the District of New Jersey, sitting by designation).

One of the exceptions to the Anti-Injunction Act's prohibition is the necessity "to protect or effectuate [the federal court's] judgments." 28 U.S.C. § 2283. This exception has been termed the "relitigation exception." The Supreme Court has stated that

> an essential prerequisite for applying the relitigation exception is that the claims or issues which the federal injunction insulates from litigation in state proceedings actually have been decided by the federal court. Moreover, . . . this prerequisite is strict and narrow.

*Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 148, 100 L. Ed. 2d 127, 108 S. Ct. 1684 (1988). The relitigation exception

> provides that when a federal court decides an issue, it can prevent the same issue from being relitigated in state court where principles of preclusion should bind the state court. This exception prevents the harassment of federal court litigants by repetitive state court proceedings and ensures the finality of the federal courts' decisions. Thus, the relitigation exception applies only in situations where because of res judicata the state court should not hear a case, but does so anyway.

---

[21] The District Court of the Virgin Islands is vested with "the jurisdiction of a District Court of the United States, including, but not limited to, the diversity jurisdiction . . . ." 48 U.S.C. § 1612 (1987).

ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 11.2.4, at 654 (2d ed. 1994). Thus this Court must determine whether the claims asserted by Hyatt against Stanton in the New York action were actually finally decided by this Court, and if so, whether principles of claim preclusion and res judicata would bar Hyatt from asserting such claims against Stanton in New York.[22]

Before an injunction may be issued under the relitigation exception, the district court must have entered a judgment. Some courts have interpreted this to mean that only final judgments permit courts to issue an injunction. 17 WRIGHT, MILLER & COOPER, *supra*, § 4226, at 549-50. However, Rule 54(a) of the Federal Rules of Civil Procedure defines "judgment" as including "a decree and any order from which an appeal lies," and it has been suggested that judgment for purposes of the anti-injunction act should parallel *Rule* 54(a). 17 WRIGHT, MILLER & COOPER, *supra*, § 4226, at 550.

 The only orders issued by this Court regarding this matter that fit within Rule 54(a)'s definition of judgment are the orders dismissing Hyatt's complaint against 35 Acres in Civil No. 1995-68, and granting partial summary judgment in favor of the Skopbank Parties in Civil No. 1995-49 which was appealed and affirmed by *the Court of Appeals for the Third Circuit. GGF v. Hyatt*, 95 F.3d 291; *GGF v. Hyatt*, 166 F.R.D. 321; Hyatt v. 35 Acres, 1996 WL 165008. The Skopbank Parties argue that Hyatt's claims in the Stanton action have been actually litigated and decided by this Court in those orders. The Court does agree that the instant Memorandum dismissing most of Hyatt's counterclaims decides the issues also brought by Hyatt in the New York action against Stanton. The

---

[22] Professor Chemerinsky notes that "after *Choo*, the lower courts are divided as to what the relitigation exception applies to. Specifically, the issue is whether the relitigation exception applies to only those matters that were actually litigated in [federal] courts or whether it applies to all that could have been litigated and thus is precluded from litigation by res judicata. Most lower courts have taken the former approach and concluded that the relitigation exception is limited to issues actually litigated in federal court. Other courts, most notably the Ninth Circuit, have held that the relitigation exception applies not only to matters that were actually litigated, but also to anything that would be barred from relitigation by res judicata." ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 11.2.4, at 656 (2d Ed. 1994). The United States Court of Appeals for the Third Circuit has not taken a position on this issue. This Court will follow the majority view, and will only enjoin those matters that have been actually litigated in front of this Court.

factual allegations contained in the Stanton action mirror the factual allegations contained in Hyatt's second amended counterclaim in this Court. (Complaint, Hyatt Corp. v. Stanton, attached as Ex. A to Skopbank Parties' Am. Br. Supp. Mot. Enjoin Prosecution of Litigation Against Stanton and to Enjoin Institution of Related Litigation filed July 22, 1996). However, today's Order dismissing most of Hyatt's counterclaims is not an order from which an appeal presently can be filed. Accordingly, at this stage in the proceedings, today's ruling does not serve as a final judgment allowing this Court to enter an injunction against the Stanton action. If this Order becomes a final judgment or a dismissal on the merits, then this Court may entertain a renewed motion to enjoin the Stanton action.

## C. Motion for Partial Summary Judgment for Equitable Accounting

The Skopbank Parties seek a partial summary judgment on Count XVIII of their first amended complaint requesting an equitable accounting. An equitable accounting is a remedy of restitution where a fiduciary defendant is forced to "disgorge gains received from the improper use of the plaintiff's property or entitlements." 1 DAN B. DOBBS, LAW OF REMEDIES § 4.3(5), at 610 (2d ed. 1993). The plaintiff makes a "prima facie case by showing a breach of fiduciary duty plus gross receipts resulting to the fiduciary, and the defendant must prove what deductions are appropriate to figure the net profit." *Id.*; see also Joel Eichengrun, Remedying the Remedy of Accounting, 60 IND.L.J. 463, 479-80 (1985); RESTATEMENT (SECOND) OF AGENCY, § 399, comment e ("In an action for accounting, the agent has the burden of proving that he paid to the principal or otherwise properly disposed of the money or other thing which he is proved to have received for the principal.") (emphasis added).

The Skopbank Parties argue that Hyatt is their fiduciary because Hyatt was an agent of the Skopbank Parties in possession of the hotel. The Skopbank Parties further argue that Hyatt breached that duty and wrongfully benefitted from the Skopbank Parties when it stayed in possession of the hotel after it was lawfully terminated in March of 1995 until September 16, 1996. The Skopbank Parties,

however, have failed to establish the dollar figure of gross receipts received by Hyatt while Hyatt was in possession of the hotel. Thus Skopbank Parties are not entitled to the technical remedy of an equitable accounting. Moreover, before discovery was generally available, the traditional accounting remedy compelled the defendant, once prima facie grounds for accounting was shown, to produce his books or other data needed. DOBBS, *supra*, § 4.3(5), at 610 (emphasis added). Dobbs observes that "in the light of extensive modern discovery, this kind of accounting has little or no use today."*Id.*

At the hearing on December 19, 1996, the Skopbank Parties persuasively argued that they should not have to bear the burden of going through the mountain of financial documents supplied by Hyatt in order to figure out how Hyatt spent the money it received while in wrongful possession of the hotel. What the Skopbank Parties seek is the preparation by Hyatt of a 'document,' whether in paper or electronic form, from the financial data acquired by Hyatt during its period of wrongful possession after the lawful termination. This 'document' would account for all funds received by Hyatt while wrongfully holding over, how these funds were handled and disbursed, and whether Hyatt should be required to disgorge gains received from the improper use of the Skopbank Parties' property or entitlements.

While the Skopbank Parties are not entitled to an equitable accounting, they are entitled to have Hyatt prepare and produce such a 'document' accounting for all the benefits it received while wrongfully in possession of the hotel, after March of 1995, including the management fee, chain allocation expenses, etc. The parties are ordered to work out the specifics and mechanics of complying with Magistrate Judge Geoffrey W. Barnard. The Court recognizes that this requirement exceeds what is encompassed by discovery in civil litigation. The equities of this case justify such an extension.

### D. Motion to Dismiss Government Guarantee Fund of the Republic of Finland as a Party Plaintiff

The Government Guarantee Fund seeks to dismiss itself as a party plaintiff, "believing that prosecution of claims by the other plaintiffs will be more than sufficient to recover damages on all

available theories from defendant Hyatt Corporation, and that GGF does not have sufficient independent damage claims to warrant its remaining a party plaintiff in this case." (Pl's Mem. Supp. Mot. Dis. GGF as Pl. filed Aug. 28, 1996, at 1.) This motion was argued in front of Magistrate Judge Geoffrey W. Barnard on September 27, 1996. Having reviewed the filings, that transcript and the pertinent cases, this Court will grant the Skopbank Parties' motion. Accordingly, GGF is dismissed as a party plaintiff with prejudice.

The Federal Rules of Civil Procedure provide that "if a counterclaim has been pleaded by a defendant prior to the service upon the defendant of the plaintiff's motion to dismiss, the action shall not be dismissed against the defendants' objection unless the counterclaim can remain pending for independent adjudication by the court." FED. R. CIV. P. 41(a)(2). Hyatt has asserted counterclaims against GGF. In opposing the motion, Hyatt stated that "our only concern is that we retain jurisdiction over GGF as a counterclaim defendant . . . . We did not want GGF by virtue of its dismissal to be any less responsive to us or its duties to be any less to us in terms of discovery." [Tr., Sept. 27, 1996, at 9.]

Whatever discover Hyatt was entitled to obtain from GGF because of GGF's status as a plaintiff, Hyatt is now only entitled to the discovery available from GGF as a counterclaim defendant. There is little reason to preserve any discovery rights Hyatt may have had with GGF as a plaintiff since the only claim remaining against GGF is the tortious interference counterclaim, which is a weak claim at best. Accordingly, GGF is no longer a plaintiff and any discovery controversy will be governed by GGF'S status as a counterclaim defendant.

### III. CONCLUSION

For the above reasons, this Court will grant the Skopbank Parties' Motion to Dismiss Hyatt's Counterclaims in part. The Skopbank Parties' Motion to Enjoin is denied without prejudice. The motion for partial summary judgment is denied, however, Hyatt is ordered to prepare an accounting document as described above. Finally, GGF is dismissed as a party-plaintiff.

ENTERED this 28th day of January, 1997.

## ORDER

For the reasons set forth in the accompanying memorandum, it is hereby

ORDERED that all of Hyatt's counterclaims except for Count One (Breach of Contract), Count Three (Tortious Interference with Contracts) and Count Ten (Breach of Guaranty of Payment and Performance) are DISMISSED; and it is further

ORDERED that the Skopbank Parties' motion to enjoin prosecution of litigation against Michael V. Stanton and related litigation is DENIED without prejudice; and it is further

ORDERED that Skopbank Parties' motion for partial summary judgment is DENIED; and it is further

ORDERED that Hyatt shall prepare and produce a 'document' which would account for all of the funds received by Hyatt while wrongfully in possession of the hotel, including accounting for management fees, chain allocation expenses etc.; and it is further

ORDERED that the Government Guarantee Fund is DISMISSED as a party-plaintiff and shall remain in the case only as a counterdefendant; and it is further

ORDERED that a ruling on Skopbank Parties' Motion to Award Damages under Supersedeas Bond and Skopbank Parties' Petition for Attorney's Fees will be deferred until the merits of the case have been determined.

ENTERED this 28th day of January, 1997.